Not Reported in F.Supp.2d
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

Page 1

C
Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

Doris VINSON, Plaintiff,
v.
GRANT/RIVERSIDE METHODIST HOSPITALS, Defendant.

**No. C2-99-1358.**

Aug. 30, 2001.

OPINION AND ORDER

SARGUS, District J.

*1 This matter is before the Court on the Defendant's Motion for Summary Judgment. (Doc. # 21). The Plaintiff claims that the Defendant Grant/Riverside Methodist Hospital ("the Hospital") discriminated against her on account of her disability when it failed to accommodate her disability by reassigning her to vacant positions, when it required her to undergo a medical examination before returning from a medical leave of absence, and when it constructively discharged her. The Plaintiff also claims that the Hospital discriminated against her on account of her age and breached an employment contract. The Defendant Hospital moves for summary judgment on all of the Plaintiff's claims. For the reasons that follow, the Court GRANTS the Defendant's Motion.

I. BACKGROUND. [FN1]

> FN1. The following statement of facts is based on the Plaintiff's deposition testimony and the uncontradicted evidence submitted by the Hospital.

The Plaintiff began working at Grant Medical Center as a histology technician in October 1975. (Vinson Depo. at 42). During the time relevant to this action, the Plaintiff reported to Juanita Swickard, who managed the Histology Lab. (*Id.* at

49-50). The Plaintiff's job duties included receiving tissue samples from pathologists, imbedding the tissue in paraffin, then cutting specimens and placing them on slides for the pathologist to analyze. (*Id.* at 34-35; Swickard Depo. at 8). In performing this work, the Plaintiff was exposed to formaldehyde, a fixative in which biopsied specimens were stored. (Vinson Depo. at 34-35).

In 1976 or 1977, the Plaintiff informed the Hospital that she had developed an allergy to formaldehyde. (*Id.* at 65). Her condition was later diagnosed in the early 1980's as "contact dermatitis." (*Id.* at 65-66). According to the Plaintiff, when she is exposed to the allergen, her hands become painful, split, cracked and raw. (*Id.* at 67-68). This reaction lasts from days to weeks depending on whether she keeps her hands appropriately medicated with the topical medicated creams she has been prescribed. (*Id.* 68-69). The reaction subsides completely when she is no longer exposed to the allergen and she uses the creams properly. (*Id.* at 70).

During her time as a histology technician, the Plaintiff requested and the Hospital provided accommodations for her allergy. Indeed, she testified that "anything that I asked for, they provided." (Vinson Depo. at 81). For example, the Hospital provided the Plaintiff with special, powderless and impermeable gloves. (*Id* . at 81-82; Swickard Aff. at ¶ 2). In addition, Ms. Swickard testified that she adapted the Plaintiff's job responsibilities as a histology technician to minimize exposure to formaldehyde by having other histology technicians take care of the periodic disposing of the formaldehyde and other chemicals. (Swickard Aff. at ¶ 2). Also, the Plaintiff began requesting leaves of absence related to her allergy which the Hospital honored without significant issue. (Vinson Depo. at 62). [FN2]

> FN2. The Plaintiff points out that her supervisor gave her a 2.8 for attendance on a performance appraisal scale of 1 to 5, where a 3 means "consistently meets" attendance goals. In other words, her review accurately indicates that the Plaintiff nearly achieved a consistently meets attendance goals standard. The Plaintiff has pointed to no adverse employment action directly related to this

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1681125 (S.D.Ohio))

Page 2

appraisal and the Court disregards it as insignificant.

On November 17, 1994, the Plaintiff informed the Hospital that her dermatologist, Dr. Linda Rupert, had diagnosed her with "recalcitrant severe hand dermatitis." (*Id.* at 72-74, Exh. 5). Dr. Rupert concluded that the Plaintiff was allergic to formaldehyde and Americlear (another fixative) and wrote that, "since she uses these chemicals at her current job, I recommend that she permanently be removed from jobs with exposure to these chemicals." (*Id.* at Exh. 5; Rupert Depo. at 72). The Plaintiff took a leave of absence from November 1994 until February 1995. (*Id.* at 75). Plaintiff admits that as a result of her dermatitis, she could no longer perform the job duties of the histology technician's job, with or without an accommodation. (Vinson Depo. at 78-79).

*2 In response to Dr. Rupert's letter, the Hospital tried to find a position for the Plaintiff where she could work away from these chemicals. (*Id.* at 76-77). At some point, the Hospital also referred the Plaintiff to a rehabilitation consultant to help the Plaintiff to return from work. (*Id.* at 88-89). The consultant came to the Plaintiff's house, asked the Plaintiff questions and used a computer to come up with different job ideas in an attempt to find a job for the Plaintiff away from her allergens. (*Id.* at 90-92). Upon her return from her leave of absence, the Hospital placed her at various sites for short periods of time until she was ultimately placed in Client Services, processing specimens sent in from doctors' offices. (Vinson at 74- 77).

The Hospital found a data entry position for the Plaintiff in Client Services entering pap smear tests in the computer, answering the telephone, and sometimes drawing blood from out-patients. (*Id.* at 77, 93). The Plaintiff continued to report to Ms. Swickard and also began reporting to Susan Davis, who shared management responsibilities over Client Services with Ms. Swickard. (*Id.* at 93-94). Ms. Swickard adapted the Plaintiff's responsibilities in Client Services so that the Plaintiff did not have to handle requisition forms that accompanied biopsies stored in formaldehyde. (Swickard Depo. at 31-33; Swickard Aff. at ¶ 3).

Plaintiff testified that she "worked for a while" in the Client Services position before her allergy

became a problem again. (Vinson Depo. at 109-10). Eventually, she informed the Hospital that she believed she was being exposed to formaldehyde because, during transport of biopsy specimens, formaldehyde would spill on the requisition forms she was required to enter into the computer. (*Id* . at 106-07, 109-10). In response to the Plaintiff's concern, Ms. Swickard again adapted Plaintiff's responsibilities so that the Plaintiff handled only requisition forms from blood samples which were not transported with biopsy specimens. (Swickard Aff. at ¶ 3).

Despite these efforts, in August of 1995, Plaintiff's dermatologist indicated that Plaintiff should be permanently removed from jobs with direct exposure to formaldehyde and Americlear and from areas where these chemicals could be spilled. (Vinson Depo., Exh. 11). Consequently, Plaintiff requested and was granted another short leave of absence. (*Id.* at 102). The Plaintiff admits that her dermatitis prevented her from performing the Client Services position and that she was aware of no accommodation that would have allowed her to perform the position. (*Id.* at 120-21).

Upon return from her leave of absence, in accordance with the Hospital's routine practice, the Plaintiff was examined by the Employee Health Department before returning to her job. (*Id.* at 98-9). Employee Health confirmed that she could return to work; however, Susan Davis, with approval from John Davis, Senior Benefits Coordinator, and Brian Saul, Director of Health and Safety, sent her back to Employee Health to take an occupational allergy test, known as a RASP test. (*Id.* at 99-101). [FN3] Plaintiff was to return home until she was notified of the test results. (*Id.* at 101). The Plaintiff alleges that she was never contacted with the test results, but instead, a week or two later, she contacted the nurse from Employee Health who told her that the test results showed that she was allergic to formaldehyde. (*Id.* at 101-02).

> FN3. The Court notes that the Hospital disputes whether this event ever occurred, but assumes for the purposes of summary judgment that it did occur. (Doc. 21 at 5, n. 7).

*3 At the same time, the Plaintiff learned from a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                    Page 3
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

friend of a position opening in the Gift Box, the hospital gift shop. (*Id.* at 124-25). Her friend, Carolyn Mayzum, was the supervisor of the Gift Box. The Plaintiff applied for the position and was hired in August, 1995. The Plaintiff did not begin her new position, however, until October when she returned from a leave of absence relating to her condition. (*Id.* at 112, 133-34).

In her position at the Gift Box, the Plaintiff was responsible for waiting on customers, ringing up sales and restocking merchandise. (*Id.* at 134-35). After working in the Gift Box for about ten months, the Plaintiff complained that her dermatitis had flared up again from handling the items to be restocked. (*Id.* at 136). She began missing work on periodic leaves of absence and admits that her dermatitis prevented her from performing her duties in the Gift Box. (*Id.* at 137-39). In October 1996, because of her absences from work caused by her dermatitis, the Plaintiff's position at the Gift Box was terminated. Again, there is no dispute that the Plaintiff could not perform the essential functions of her position at the Gift Box with or without an accommodation. (*Id.*)

The Plaintiff alleges that, during her tenure at the Gift Box, her supervisors made age based comments to her. For instance, sometime in March 1995, while the Plaintiff was still employed at the Gift Box, she had a conversation with Ms. Swickard regarding her dermatitis. Ms. Swickard said to her in a stern voice "have you ever considered taking early retirement." (*Id.* at 289-91). In addition, in a different conversation, Ms. Mayzum asked her "why don't you just retire?" (*Id.* at 305-06). The Plaintiff admits that neither Ms. Swickard nor Ms. Mayzum pressured her to retire. (*Id.* at 292, 304-09). [FN4]

> FN4. The Hospital points out that Ms. Mayzum and Ms. Swickard either deny that they made these statements or else do not recall making them. The Hospital assumes for the purposes of its Motion only that the statements were made. (Doc. # 21 at 25, n. 18).

Following her termination from the Gift Box, and upon return from another leave of absence occasioned by her dermatitis, the Plaintiff worked

with John Davis, a Senior Benefits Coordinator, who was involved in moving her through "bridge assignments." (J. Davis Depo. at 18). Although Mr. Davis mostly worked with the Plaintiff on Workers' Compensation related matters, the object of this effort was to place the Plaintiff into a new permanent position. (Vinson Depo. at 154; J. Davis Depo. at 17, 23). To do so, the Hospital allowed the Plaintiff to participate in its new "Transitional Work Program" even though this program was designed to help ease individuals with medical conditions back into their *original* jobs through a series of increasingly more challenging bridge assignments. (J. Davis Depo. at 13-15, 17-19). The Plaintiff was allowed to select several of these bridge assignments which she thought she could perform. (Vinson Depo. at 154-55; J. Davis Depo. at 18). Mr. Davis also had Dr. Rupert review the job descriptions for each position assignment, indicate whether the Plaintiff could perform the positions, and list accommodations the Plaintiff would require if any. (Rupert Depo. at 81-82, Exh. 1). Dr. Rupert approved all three bridge assignments selected by the Plaintiff "as is." (*Id.* at 81-82). The Plaintiff's last bridge assignment was as a medical secretary in the Cardiovascular Department where she performed clerical work such as typing labels and filing. (Vinson Depo. at 176-81).

*4 Subsequently, on July 14, 1997, Patty Lowe, Plaintiff's supervisor in the Cardiovascular Department, hired the Plaintiff into the medical secretary position. (Vinson Depo. at 181, 183). [FN5] Mr. Davis testified that he felt the Hospital had finally found an ideal placement for the Plaintiff. (J. Davis Aff. at ¶ 3). Nonetheless, in September 1997, the Plaintiff informed Ms. Lowe that she felt she could no longer perform the position because she was being exposed to formaldehyde found on the old file folders and in the copier fluid. (Vinson Depo. at 186-89). Accordingly, in the fall of 1997, the Plaintiff left her medical secretary position and went on a six month leave of absence. (Lowe Depo. at 22).

> FN5. The Plaintiff suggests that she was required to apply and compete for the permanent medical secretary position. (Doc. # 23 at 4). The record, however, does not support this assertion. (Vinson Depo. at 215; Lowe Depo. at 16(stating simply that she offered the permanent

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1681125 (S.D.Ohio))

Page 4

position to the Plaintiff).)

During this leave of absence, the Plaintiff looked through the job posting manual in the Human Resources Department for a job she could perform. (Vinson Depo., Exh. 20). Mr. Davis spoke with the Plaintiff during this process and assisted her by providing her with information by which she could follow up with recruiters. (J. Davis Depo. at 27). The Plaintiff found seven positions which she believed she could perform. (Vinson Depo. at 216-25). She applied for these positions. (*Id.*) Of the seven positions she identified, four had been filled by the time she applied, she lacked the requisite clerical or computer experience for two and the last was filled by someone she admits was more qualified than her. (*Id.* at 216-25, 320).

In addition to these positions, the Hospital suggested certain positions at its branch locations that satisfied the Plaintiff's medical restrictions. Plaintiff rejected or refused to apply for these positions because they required her to drive on expressways and the Plaintiff prefers not to drive on expressways. (*Id.* at 23, 267-68, 389).

On March 15, 1998, the Plaintiff's medical leave of absence expired. Rather than terminating her employment as provided by the Hospital's policy, the Hospital placed her on "contingent status" [FN6] for six months so that she could have additional time to find an open position. (Vinson Depo. at 313). Nonetheless, in July 1998, the Plaintiff submitted a letter to the Hospital announcing her retirement effective September 15, 1998, the date on which her contingent status was to expire. (*Id.* at 225, Exh. 25). The Plaintiff now alleges that the Hospital constructively discharged her by not awarding her any of the positions for which she applied.

> FN6. An employee on contingent status at the Hospital is employed without a full-time equivalent status and benefits and works as needed and as scheduled by a manager. (J. Davis Depo. at 32-33).

Since retiring from the Hospital, the Plaintiff worked at Integrated Fitness as a receptionist for a few months. She left the job because of an illness in the family. (*Id.* at 230-33). She chose not to reapply because she did not enjoy the work (*Id.* at 233). Plaintiff is currently employed part-time as a receptionist at Columbus Cadillac. (*Id.* at 17).

## II. SUMMARY JUDGMENT STANDARD.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> *5 The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.,* 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment." ' *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257). The nonmoving party must adduce more than a mere

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                    Page 5
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts." ' *Id.* (quoting *Matsushita,* 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

III. ANALYSIS.

In her Complaint, the Plaintiff alleges that the Hospital discriminated against her on account of her disability and her age in violation of federal law, state law and Ohio's corresponding public policies against discrimination. The Plaintiff also alleges that the Hospital breached an employment contract with her. The Hospital moves for summary judgment on all of the Plaintiff's claims.

A. DISABILITY DISCRIMINATION CLAIM. [FN7]

> FN7. The Court, like the Parties, shall analyze the Plaintiff's federal and state law discrimination claims simultaneously.

**\*6** Under the Americans with Disabilities Act (the "ADA"), it is unlawful for an employer to discriminate against a qualified individual [FN8] in the terms and conditions of employment based on that individual's disability. 42 U.S.C. § 12112(a). In order to recover under the ADA, plaintiffs must show that (1) they suffer from a disability; (2) they are qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) they were discriminated against by reason of their disability. *See Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1178 (6th Cir.1996). The parties contest whether the Plaintiff is a qualified individual with a disability; however, for the sake of this Opinion and Order, the Court assumes that the Plaintiff satisfies this statutory prerequisite. Instead the Court shall focus on whether the Hospital discriminated against the Plaintiff on account of her assumed disability.

> FN8. A determination of whether an individual is qualified is made according to (1) whether the individual meets the necessary prerequisites for the job, such as education, training, experience; and (2) whether the individual can perform the essential job functions with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).

The Plaintiff argues that the Hospital discriminated against her in four different ways: (1) when it required her to submit to an unauthorized medical examination, (2) when it failed to allow her to return to work following a medical leave despite medical certification from both the Plaintiff's doctor and from the Hospital's Employee Health Department, (3) when it refused her request for accommodation in the form of a transfer to a vacant position, and (4) when it constructively discharged her. The Court addresses these different bases for discrimination in order.

1. Medical Examination.

The Plaintiff claims that the Hospital discriminated against her when, in August 1996, it required her to undergo the RASP allergy test before allowing her to return from her medical leave of absence. The Plaintiff acknowledges that medical exams are permitted under the ADA when they are job related and justified by business necessity. The Plaintiff, however, asserts that the Hospital has failed to come forward with any evidence demonstrating that the medical examination in this case was job related and justified by business necessity. The Hospital argues that the medical exam was job related and consistent with business necessity because the Hospital reasonably believed that the Plaintiff's ability to perform her job duties would be impaired by a medical condition. The Court agrees with the Hospital.

The ADA prohibits an employer from discriminating against disabled employees by requiring medical examinations and inquiries under certain circumstances. 42 U.S.C. § 12112(d). Specifically, the ADA provides as follows:

(A) Prohibited examinations and inquiries
   A covered entity shall not require a medical examination and shall not make inquiries of an

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                          Page 6
(Cite as: 2001 WL 1681125 (S.D.Ohio))

employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries
    *7 A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.
42 U.S.C. § 12112(4). Thus, an employer discriminates against a disabled employee by requiring the employee to take a medical exam that is not job- related and consistent with business necessity and if the employer limits the employee's opportunities.

The term "discriminate" is also construed in the statute to include, *inter alia*, the following:
    limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
42 U.S.C. § 12112(b)(1). Thus, an employer also discriminates against a disabled employee by limiting the employees opportunities on account of his or her disability.

In *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804 (6th Cir.1999), the Sixth Circuit analyzed the "job related and consistent with business necessity" standard in the context of employer requested medical examinations for employees:
    for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can "perform job-related functions."

                    * * *
[H]ealth problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination even if the examination might disclose whether the employee

is disabled or the extent of any disability. [internal quotations omitted].
*Id.* at 811-12. In sum, for an employer to require an employee to submit to a medical examination there must be some reasonable basis to doubt that the employee can "perform job-related functions ." *See also* EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, q.5 (July, 2000)("Generally, a disability-related inquiry or medical examination for an employee may be 'job related and consistent with business necessity' when an employer has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition ....")

The Plaintiff argues that the Hospital violated its duties under the ADA when her supervisors required her to undergo an occupational allergy exam after she presented her doctor's work release slip to the Hospital's Employee Health Department and the Department authorized her to return to work. This medical examination was not required by the Hospital's regular procedure of allowing an employee to return from work upon approval from the Employee Health Department. Nevertheless, the Court finds that these circumstances do not violate the ADA.

*8 At the time the Plaintiff was required to undergo a medical examination, it was well over fifteen years after the Plaintiff first reported her allergy to the Hospital. Up until that point, the Hospital had accepted without question the Plaintiff's statements and her doctor's diagnoses regarding her allergy and her work environment. The Plaintiff admits that during that fifteen year period, the Hospital provided her with any accommodation that she requested. The Hospital restructured her job duties as a histology technician, it provided her with special gloves, it had granted her multiple leaves of absence, it had placed her in a new position with an aim toward removing the allergen from her work place, it had restructured her duties in the new position after she had experienced additional reactions, and it had granted her another leave of absence. The Hospital undertook all of these activities based on the Plaintiff's reports that her allergic reactions were the result of formaldehyde in her work environment. In addition, despite all of these efforts to prevent further allergic reactions,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

(Cite as: 2001 WL 1681125 (S.D.Ohio))

the Plaintiff admittedly continued to have allergic reactions that were severe enough to warrant her leaves of absence and to question whether she could continue to perform the essential functions of her position. In short, the Hospital had done everything it could to remove the supposed allergen from her work environment and yet the problem persisted.

Bryan Saul, the Hospital's Director of Safety who allegedly signed the order for the allergy test, testified that he had suggested an allergy test to determine whether the Plaintiff was allergic to something other than formaldehyde, namely, the latex in the latex gloves the Plaintiff wore at work. (Doc. # 21 Exh. G ¶¶ 1,2; Vinson Depo. at 101). The purpose of the test, according to Mr. Saul, was to attempt to identify the source of the allergy problem so that further exposure to the source could be eliminated or reduced. (Doc. # 21, Exh. G. at ¶ 3).

Based on these circumstances, the Court concludes the Hospital had "significant evidence that could cause a reasonable person to inquire as to whether [the Plaintiff was] still capable of performing [her] job." *Sullivan,* 197 F.3d at 812. The Plaintiff had health problems that significantly affected her performance of essential job functions. The Hospital's extensive efforts to address these problems had been unsuccessful. Therefore, the Hospital was justified in ordering a medical examination to determine the extent of the Plaintiff's allergy so that it could make a determination on how best to accommodate her. In these circumstances, the Plaintiff's supervisors could lawfully initiate an allergy test to verify that the accommodations they were providing the Plaintiff were properly designed. 29 C.F.R. pt. 1630. App. (stating that 29 C.F.R. § 1630.14(c) permits "employers or other covered entities to make inquiries or require medical examinations necessary to the reasonable accommodation process described in this part."). Thus, the unrefuted evidence of record demonstrates that the Hospital ordered the test to look for further and more effective means of accommodation, not for a purpose hostile to goals of the ADA.

2. Exclusion from the Workplace.

*9 The Plaintiff also argues that an employer is only permitted to exclude an employee from the work place where the employee presents a direct

threat to the health or safety of others in the workplace and that the Hospital has failed to carry that burden here. She alleges that the Hospital violated the ADA when it improperly sent her home until the allergy test results were obtained and that no one from the Hospital ever contacted her with the results of the test. The Court disagrees.

The Sixth Circuit has expressly held that a fitness for duty medical examination may be ordered when it is job related and consistent with business necessity and that "[t]here is no reason to confine the employer's ability to determine the fitness of employees only in instances where they pose a direct threat." *Sullivan,* 197 F.3d at 812. An employer may require an employee to submit to a physical and mental exam prior to returning to work. *See Pesterfield v. TVA,* 941 F.2d 437, 438 (6th Cir.1991). Moreover, medical leaves of absence are, in some circumstances, an acceptable form of accommodation, and an employee is not entitled to demand the accommodation which he or she prefers. *Walsh v. UPS,* 201 F.3d 718, 726 (6th Cir.2000)( "this Circuit has recognized that a medical leave of absence can constitute a reasonable accommodation") (citing *Cehrs v. Northeast Ohio Alzheimer's Res. Cntr.,* 155 F.3d 775 (6th Cir.1998); *Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1019 (8th Cir.2000) ("the employer is not obligated to provide the accommodation requested or preferred by the employee[.]"). In addition, because the Plaintiff was experiencing painful skin abrasions, the actions of the Hospitals were designed to improve the Plaintiff's health. (Vinson Depo. at 112, 124-25, 133-34). For all these reasons, the Court concludes that the Hospital did not discriminate against the Plaintiff by sending her home on medical leave until the results of her occupational allergy test were known.

Plaintiff also argues that the fact that no one from the Hospital contacted her with the results of the test indicates a violation of the ADA. She testified, however, that she contacted the nurse in employee health and learned the results herself within a week or two of the test. (Vinson Depo. at 101). The Court concludes that in this short a time frame, no adverse conclusion can be drawn by the failure of the Hospital to contact the Plaintiff with the results. This is especially true where the delay did not limit the Plaintiff's employment opportunities. In the same month that the Plaintiff took the RASP test,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                    Page 8
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

she was hired into her position at the Gift Box. (*Id.* at 124-25). The Plaintiff was unable to start her position at the Gift Box until nearly two months after she was hired because her hands had to heal. (Vinson Depo. at 112, 133-34). In other words, because the Plaintiff's medical condition prevented her from beginning her new position immediately, the Plaintiff was not limited in her opportunities as a result of any delay in receiving the test results. *See* 42 U.S.C. § 12112(b)(1).

3. Reassignment.

*10 The crux of the Plaintiff's ADA claim is her allegation that the Hospital discriminated against her on account of her disability by failing to reasonably accommodate her through reassignment to a vacant position. The Plaintiff argues that an employer's duty under the ADA to consider reassignment as a reasonable accommodation requires the employer to affirmatively place an employee with a disability in a vacant position that the employee is qualified to perform with or without a reasonable accommodation. According to the Plaintiff, the Hospital violated its duty to accommodate the Plaintiff through reassignment because it merely allowed the Plaintiff to compete equally with other applicants for vacant positions. Specifically, the Plaintiff asserts that the Hospital did not transfer or place the Plaintiff in any permanent position after she left the histology lab. Rather, the Plaintiff asserts that, for those positions she held, she submitted applications and was hired by the relevant supervisors. Once it was clear she could no longer work in the cardiovascular department, according to the Plaintiff, she applied for a number of positions and was not hired. Moreover, the Plaintiff asserts that the Hospital did nothing to help her find any suitable positions. The Hospital contests the Plaintiff's characterization of its efforts to accommodate her allergy.

There is currently a split in the circuits as to whether an employer can satisfy its duty to accommodate an employee through reassignment by simply allowing the employee to compete for vacant positions. [FN9] This Court concludes that the Sixth Circuit has accepted the Seventh Circuit's position on the issue that, in certain circumstances, an employer can satisfy its duty to accommodate an employee through reassignment by allowing the employee to compete for vacant positions. More importantly, however, based on the totality of the

circumstances in this case, the Court concludes that the Hospital did not violate its duty to reasonably accommodate the Plaintiff through reassignment.

> FN9.    *Compare    EEOC    v. Humiston-Keeling, Inc.,* 227 F.3d 1024 (7th Cir.2000); *with Smith v. Midland Brake, Inc.,* 180 F.3d 1154 (10th Cir.1999) ; *see also Burns,* 222 F.3d at 256-57.

The term "discriminate" is construed in the ADA to include, *inter alia,* the following:
(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.
42 U.S.C. § 12112. Thus, an employer discriminates against a disabled employee if the employer fails to make a reasonable accommodation for the employee or denies an employee an opportunity because of the need to make a reasonable accommodation.

*11 A reasonable accommodation can include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position...." 42 U.S.C. § 12111(9)(B). An employee always bears the burden of demonstrating that a proposed accommodation is reasonable under the circumstances. *Walsh,* 201 F.3d at 725. [FN10] If the employee carries this burden then an employer can show that it is not required to make such an accommodation because the accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A).

> FN10. The parties dispute whether this is a direct evidence or an indirect evidence case. The Court concludes that the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                    Page 9
(Cite as: 2001 WL 1681125 (S.D.Ohio))

distinction makes no difference for the purposes of analyzing whether the Hospital provided a reasonable accommodation to the Plaintiff. *Walsh,* 201 F.3d at 725 ("The burden of establishing that the proposed accommodation is reasonable remains with the plaintiff, regardless of whether plaintiff has direct or indirect evidence in support of his or her ADA claim.")(citing *Monette,* 90 F.3d at 1187).)

Reassignment is an accommodation of last resort. *See, e.g., Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1019 (8th Cir.2000). An employer need not consider reassignment as a form of accommodation until it is clear that the employee cannot perform his or her current position with or without a reasonable accommodation. The parties do not dispute that the Plaintiff in this case could not longer perform her duties as Histology technician. Consequently, the circumstances in this case gave rise to the Hospital's duty to consider reassignment. The dispute is whether the Hospital fulfilled its duty to reasonably accommodate the Plaintiff through reassignment. The Court concludes that there is no genuine issue of fact that the Hospital satisfied its duty to reasonably accommodate the Plaintiff through reassignment.

In *Burns v. Coca Cola Enter., Inc.,* 222 F.3d 247 (6th Cir.2000), the Sixth Circuit analyzed the employer's duty to reassign a disabled employee as follows:

Although this court has not had occasion to define the extent of an employer's obligation to reassign a qualified individual with a disability, the Seventh Circuit has held "that the ADA places a duty on the employer to 'ascertain whether he has some job that the employee might be able to fill.' " *Dalton [v. Subaru-Isuzu Automotive, Inc.,]* 141 F.3d [667,] 677[ (7th Cir.1998) ] (quoting *Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 487 (7th Cir.1997)). As the Seventh Circuit observed in *Dalton:*

The employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable

accommodations. The employer's duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion.

Id. at 678 (citing 29 C.F.R. § 1630.2(j)(3)(ii)(C)).

* * *

We agree with the Seventh Circuit that an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified. We do not, however, hold that the employer must reassign the disabled employee to a position for which he is not otherwise qualified, or that the employer must waive legitimate, non-discriminatory employment policies or *displace other employees' rights to be considered* in order to accommodate the disabled individual.
**\*12** *Id.* at 257 (emphasis added). The Sixth Circuit has defined the duty to reassign an employee as requiring the employer to identify a wide range of positions for which the employee may be qualified and to consider transferring the employee to one of those positions within the framework of its legitimate non-discriminatory policies. The language that an employer need not "displace other employees' rights to be considered" suggests that the employer satisfies its duty to reassign by allowing a disabled employee to compete for a position with other candidates.

In *Burns,* the Sixth Circuit applied this standard to affirm the district court's grant of summary judgment to an employer on an ADA claim brought by a product deliverer who was constructively discharged after he suffered a serious on-the-job-back injury. After being placed on a temporary light duty assignment and then on medical leave, the employee filled out two applications for transfers pursuant to the employer's transfer policy. The employee was not qualified for one position and failed to obtain the other position because he told the interviewer "he did not think he would like it but [he] would try." The employee did not apply for a number of other posted positions for which he was qualified. Although he never received notice that he was terminated, he claimed that he was constructively discharged because the employer failed to accommodate him through reassignment.

The Sixth Circuit held that the employer had not

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                          Page 10
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

violated its duty to accommodate the employee through reassignment because the employee failed to comply with the employer's transfer procedure, having only applied and interviewed for one position for which he was qualified (failing to obtain an offer) and failing to file a transfer applications for any of the numerous other positions available. The Court stated that "[a]llowing Burns to recover despite his failure to abide by KCC's non-discriminatory policy requiring him to apply for a transfer to a new position within his restrictions would 'convert a nondiscrimination statute into a mandatory preference statute, a result which would be inconsistent with the nondiscriminatory aims of the ADA." ' *Id.* at 258 (quoting *Dalton* 141 F.3d at 679.) The Court went on to state that "although KCC arguably could have ... *considered* Burns for more than one vacant position despite his failure to file more than one Transfer Request, KCC's failure to do so does not constitute a violation of its duty to accommodate Burns's disability under the ADA." *Id.* (emphasis added). Thus, the Sixth Circuit has indicated that it views the duty to accommodate an employee through reassignment as requiring an employer to assist the employee in identifying appropriate positions and then to consider the employee through the application of its usual, non-discriminatory policies. *See also EEOC v. UPS,* 249 F.3d 557, 563 (6th Cir.2000)("we have recently joined the Seventh Circuit in holding that "an employer has a duty under the ADA to *consider transferring a disabled employee....* "); *Humiston,* 227 F.3d at 1029("The ADA does not require an employer to reassign a disabled employee to a job for which there is a better applicant, provided it's the employer's consistent and honest policy to hire the best applicant for the particular job in question rather than the first qualified applicant.") [FN11]

> FN11. In addition, the Sixth Circuit, on has at least two occasions, affirmed an employer's efforts to accommodate an employee through reassignment where the employee was merely allowed to interview for vacant positions which the employee did not obtain. *See Burns,* 222 F.3d at 249-50, 258-59; *Monette,* 90 F.3d at 1176, 1187; *Cf. Dougherty v. City of El Paso,* 56 F.3d 695, 699-700 (5th Cir.1995)("we not read the ADA as requiring affirmative action in favor of individuals with

disabilities in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled.")

*\*13 In this case, the Plaintiff concedes that the Hospital reasonably accommodated her up through her position as a histology technician and also that the Hospital reasonably accommodated her by transferring her to the Client Services Department. (Doc. # 23 at 2). After the Plaintiff was unable to perform the Client Services positions, the Hospital took affirmative steps to help find the Plaintiff an alternative position. The fact that the Plaintiff may have learned on her own of an open position at the Gift shop for which she was hired does not mean that the Hospital failed in its duty to accommodated her. It simply means that the Plaintiff took the steps that any prudent employee in her position would take, namely using all available resources (including her personal contacts) to find alternative employment. In addition, the Hospital accommodated the Plaintiff during this time period by granting her a leave of absence [FN12] to recover from her last allergy flare up before she took the Gift shop position.

> FN12. The Plaintiff suggests that the leaves of absences were not accommodations. This suggestion is without merit. *See, e.g., Walsh v. UPS,* 201 F.3d 718, 726 (6th Cir.2000).

Once the Plaintiff was unable to perform the Gift shop position, the Hospital took affirmative steps to reassign the Plaintiff by placing her in various temporary positions in an effort to find her a permanent position. The Hospital worked with the Plaintiff and her doctor to ensure that these temporary placements were consistent with her medical restrictions and the doctor approved each of the positions. The doctor's prior approval is important to show that the Hospital was not simply placing her in positions where it knew she would fail, but rather, it made a good faith effort to find her other positions that were consistent with her medical condition. An employer may reasonably accommodate an employee through temporary assignments until on appropriate permanent position becomes available or as part of an effort to place

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

the employee in a permanent position, as was the case here. *See Hendricks-Robinson v.. Excel Corp.,* 154 F.3d 685, 696-97 (7th Cir.1998); *Dalton,* 141 F.3d at 680; U.S. Equal Employment Opportunity Commission, A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act ¶ 9-5 (1992) ("[I]f an employer already has a vacant light duty position for which an injured worker is qualified, it might be a reasonable accommodation to reassign the worker to that position. If the position was created as a temporary job, a reassignment to that position need only be for a temporary period.")

The Plaintiff's last temporary assignment as a medical secretary in the Cardiovascular Department became her next permanent assignment. In placing her in this permanent assignment, the Hospital again reasonably accommodated her. The Plaintiff dismisses this process because she suggests she had to apply and compete for the position like any other applicant. As noted above, requiring that a disabled employee compete for a vacant position on equal terms with other applicants does not violate the ADA. In any case, the Plaintiff has pointed to no evidence that shows that she had to compete for this position. Rather, the Plaintiff testified that she "graduated" from the temporary position into the permanent medical secretary position. (Vinson Depo. at 215; *see also* Lowe Depo. at 16). Thus, the record does not support her assertion that she applied for and was awarded the position through the usual competitive process. Moreover, even if she had to compete for the position, the Hospital provided her with the competitive advantage of having worked the position on a temporary basis before having to apply for it as a permanent assignment. Thus, the Hospital reasonably accommodated the Plaintiff both by placing her in the medical secretary position temporarily and then permanently.

*14 After leaving the medical secretary position two months later, the Plaintiff went on a six month leave of absence followed by a six month period on contingency status. The law is clear that an employee need not place an employee on medical leave indefinitely. *Monnette,* 90 F.3d at 1187. By allowing the Plaintiff to stay on medical leave for six months, and contingency status for another six months, the Hospital again reasonably accommodated her.

There is no genuine issue of material fact both that the Hospital took affirmative steps to assist the Plaintiff in her own search for a position at the Hospital and that it took its own steps to locate positions for her as well. While on medical leave, the Plaintiff worked with the Hospital's human resources personnel in her attempt to find a position. The Plaintiff made an effort to come into the Hospital once a week to look at the job postings and to fill out the appropriate application forms. The Hospital's human resources administrator assisted her in this endeavor by talking with her about openings and the application process, and by providing her with information by which she could follow up with recruiters.

Moreover, the Hospital also suggested certain positions to the Plaintiff which she rejected because they required her to drive on the expressway. There is no suggestion that her preference to avoid driving on the expressway was related to her medical condition.

In certain circumstances, an employer can fulfill its duty to accommodate a disabled employee through reassignment where it takes affirmative steps to help locate appropriate positions for the employee. *See Burns,* 222 F.3d at 258 (affirming summary judgment where the employer "did make some effort to discharge its duty to ascertain whether it had some job [the plaintiff] might have been able to fill."). In this case, in addition to assisting the Plaintiff in her own efforts to find an appropriate position, the Hospital affirmatively assisted the Plaintiff in identifying positions by suggesting certain positions to the Plaintiff. The Plaintiff refused to apply for these positions for reasons unrelated to her disability.

Case law is clear that once an employee rejects a reasonable accommodation the employer's duty to reasonably accommodate the employee is fulfilled. *Id.* at 258; *Keever v. City of Middletown,* 145 F.3d 809, 812-13 (6th Cir.1998) (employer not liable where employee refused reasonable accommodation of reassignment to desk job); *Hankins v. The Gap, Inc.,* 84 F.3d 797, 802 (6th Cir.1996)(a plaintiff's refusal to accept a reasonable accommodation precludes her from arguing that other accommodations should have been provided); *Schmidt v. Methodist Hosp.,* 89 F.3d 342, 344-45 (7th Cir.1996); *Gile v. United Airlines, Inc,* 95 F.3d 492, 499 (7th Cir.1996) ("[W]hen an employee

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                      Page 12
(Cite as: 2001 WL 1681125 (S.D.Ohio))

requests a transfer as a reasonable accommodation and the employer offers alternative reasonable accommodation, which the employee then refuses, the employer cannot be held liable for failing to reasonably accommodate him by not transferring him to another position."); *see also Webster v. Methodist Occupational Health Centers, Inc.,* 141 F.3d 1236, 1238 (7th Cir.1998); *Hall v.. Claussen,* 246 F.3d 681, Table, 2001 WL 219088 *5 (10th Cir., Mar 06, 2001) ("if the employee rejects an offer of reassignment that is consistent with an employer's duties of reasonable accommodation under the ADA, the employer is not required to offer additional reassignment."); *Cf.* 29 C.F.R. § 1630.9(d) (if an employee rejects a reasonable accommodation, aid, service, opportunity or benefit necessary for him to perform an essential function of his position, he or she is not considered a qualified individual with a disability). An employee is entitled to a reasonable accommodation but not necessarily to the accommodation of her choice. *See, e.g., Rehling v. City of Chicago* 207 F.3d 1009, 1014 (7th Cir.2000) ("It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer.") Therefore, by suggesting positions to the Plaintiff that she rejected because she refused to drive on the expressway, the Hospital fulfilled its duty to accommodate her through reassignment.

*15 The Plaintiff, however, focuses on the positions for which she believes she was qualified, for which she applied and for which she was rejected. [FN13] The Court concludes that these facts do not support a claim under the ADA for a number of reasons. First, the record reveals that a number of the positions the Plaintiff applied for were filled when she applied or else she admits that she did not have the requisite experience or skills. (Vinson Depo. 215-25). In addition, the Plaintiff interviewed for at least one position that was awarded to a more qualified applicant.

> FN13. The Plaintiff asserts that the Hospital's own vocational experts concede that she had the skills for the positions in question. The Court concludes that this is inaccurate. In fact, the Hospital's vocational experts concluded that she had the aptitude to *develop the skills* needed

for the positions. Nonetheless, the Court assumes with the parties that the Plaintiff was minimally qualified for the positions in question, while noting however, that an employer has no special duty to train a disabled employee in order to allow the employee to develop skills needed to obtain an alternative vacant position. *See Williams v. United Ins. Co.,* 253 F.3d 280, 282 (6th Cir.2001).

Next, as indicated above, the ADA does not require an employer to affirmatively place a disabled worker in a position over a more qualified applicant when it is the employer's ordinary policy to hire the best qualified applicant (as opposed to the first qualified applicant). In this case, the Hospital has an undisputed policy of awarding an open position to the best qualified candidate. The Plaintiff has conceded that she was not the most qualified candidate for the positions she sought. Consequently, the Hospital did not violate its duty to accommodate her by reassigning her.

Further, even if ADA created such a duty, in this case, the fact that the Plaintiff refused to even apply for positions suggested by the Hospital undercuts her assertion that she should have been placed in the positions for which did apply. The Plaintiff argues that she was not required to apply for the positions suggested by the Hospital because the Hospital was not offering to affirmatively place her in them. (Doc. # 23 at 23). [FN14] Nevertheless, the Plaintiff concedes that the Hospital was entitled to interview her to determine, at a minimum, that she and the supervisor were compatible. (Doc. # 23 at 20). Thus, as the Plaintiff acknowledges, an employer is not required to waive legitimate non-discriminatory hiring polices and practices including, as in this case, its application requirements. *See Burns,* 222 F.3d at 258. In other words, to even argue that the Hospital's transfer practice did not go far enough to place her in the positions suggested by the Hospital, the Plaintiff must have at least complied with the process by at least applying for these positions. *See id.* (finding for employer where employee failed to apply for vacant positions within his restrictions). By rejecting the process from the beginning, the Plaintiff has no grounds on which to complain that the process was insufficient. *See Rehling* 207 F.3d at 1014 ("an employee who requests a transfer

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1681125 (S.D.Ohio))

cannot dictate the employer's choice of alternative positions.")

> FN14. Plaintiff relies on the testimony of William Holzmann who testified that Human Resources was not authorized to directly place an employee into a vacant position. (Holzmann Depo. 35-37) Holzmann did say that he would speak to the hiring manager and request that a disabled employee get the position over an outside candidate. (*Id.* at 36). In addition, Holzmann said that he would attempt to block external candidates from consideration for a position for which a disabled worker had applied. (*Id.* at 37). Moreover, the Plaintiff's own testimony establishes the affirmative efforts that the Hospital took to place her into nearly all of the various positions she held after her histology technician position. (Vinson Depo. at 76 (agreeing that the Hospital moved her between various temporary position), 77(agreeing that the Hospital was trying to find her a position away from allergen and that the Hospital "found" her the client service position); 154 (agreeing that Mr. Davis was trying to find her a place to work and that she was "placed" in bridge assignments); 181- 84(agreeing that as a result of having been placed in a bridge assignment in the cardiovascular department, she was hired on a permanent basis there). Thus, it is an inaccurate reflection of the record to say that the Hospital provided no assistance in placing the Plaintiff.

Finally, under the totality of the undisputed circumstances of this case, the Court concludes that no reasonable juror could that conclude the Hospital failed to reasonably accommodate the Plaintiff. There is no dispute that the Hospital reasonably accommodated the Plaintiff for approximately fifteen years while she worked her histology technician position. Once the Plaintiff was unable to perform her histology technician position, the Hospital took affirmative steps to find the Plaintiff an alternative position, consistent with her medical condition, for over three years. During that time the Plaintiff worked in three permanent positions, and

at least a half a dozen temporary positions, took a number of leaves of absence, worked with various Hospital officials to match her skills and her condition with an appropriate position, and, in the positions she did obtain, she had her duties restructured. In addition, the Hospital placed her on medical leave for six months and contingency status for six months during which time it took affirmative steps to identify vacant positions she could perform. Finally, the Hospital never notified her that she was terminated. In these circumstances, the Court concludes that the Hospital satisfied its duty to reasonably accommodate the Plaintiff. *See, e.g., Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 635 (7th Cir1998)(affirming summary judgment in favor of employer on employee's claim that employer failed to accommodate her allergy where employer attempted numerous accommodations which failed and plaintiff failed to demonstrate an objectively reasonable accommodation not pursued by the employer).

4. Constructive Discharge.

*16 The Plaintiff asserts that because the Hospital refused to take any affirmative steps to transfer her to a position that was within her restrictions, she had no choice but to retire. She concludes therefore that her retirement was a constructive discharge based on her disability. Specifically, she argues that because she was on contingent status, with no pay or benefits, facing termination with no one to help her in her search for other employment at the Hospital, a reasonable person could believe that she had not choice but to retire. The Court rejects this argument because, for the reasons stated above, the Hospital fulfilled its duty to reasonably accommodate her.

B. AGE DISCRIMINATION CLAIM.

The Hospital also moves for summary judgment on the Plaintiff's age discrimination claim. The Plaintiff presents three bases for her claim that the Hospital discriminated against her on account of her age: (1) the Hospital failed to provide her with the opportunity to train on a new computer system when that opportunity was provided to a younger person; (2) the Hospital refused to allow the Plaintiff to attend a national seminar while allowing a younger person to attend; and (3) during the course of a conversation related to her allergy, two different supervisors asked her about retiring.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1681125 (S.D.Ohio))

According to the Plaintiff, the Hospital unlawfully considered her age when it refused to train her for alternative positions or to help her find alternative employment.

For the Plaintiff to establish her age discrimination claim under the *McDonnell Douglas* framework, the Plaintiff must establish a prima facie case by showing (1) that she was over 40, (2) that she was qualified for her position and meeting her employer's legitimate expectations, (3) that the employer took an adverse action against her, and (4) that the employer's decision to take such action was motivated by age based animus. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir.1992). The Plaintiff may satisfy the fourth prong of her prima facie case by demonstrating that the employer treated similarly situated employees more favorably than her or through other circumstances that tend to show an age based animus. *Id.* To establish that an another employee was similarly situated, the Plaintiff must demonstrate that the employee was similar in all relevant respects. *Id.* In addition, to establish an adverse employment action, the Plaintiff must demonstrate a materially adverse change in the terms and conditions of employment. *See Kocsis v. Multi-care Management, Inc.*, 97 F.3d 876, 885-86 (6th Cir.1996). For a change in the terms and conditions of employment to be materially adverse, it must be more than a mere inconvenience or an alteration in job responsibilities. *Id.* Materially adverse changes include termination, reduction in wages or salary, a less distinguished title, a significant loss of benefits, or a reduction in material job responsibilities. *See Hollins Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999).

*17 The Hospital asserts that the differences in treatment the Hospital allegedly afforded other employees do not demonstrate age discrimination. As for the computer training, it is undisputed that two employees were sent to Tucson for this training and that one of the employees was in her thirties and the other was in her fifties. (Swickard Depo. at 37-39). In addition, the documentary evidence demonstrates that the Hospital's policy was to send only one employee from each department, generally a manager, to such training. (*Id.* at 42-43). The employee who was in her fifties who was a manager of a different department. (*Id.*). The evidence also shows that as a histology technician, the Plaintiff's interaction with the computer system was limited because the results of her work were entered by transcriptionists. (*Id.* at 42).

The Plaintiff's age claim based on the Hospital's denial of computer training fails on both the third and fourth prongs of her prima facie case. First, the Plaintiff cannot demonstrate an adverse action based on these events. The Plaintiff has failed to identify any evidence in the record that she requested the computer training; thus, there is no evidence to suggest that the Hospital affirmatively decided not to send the Plaintiff by denying her request to go. (Doc. # 23 at 26, n. 96 (citing Swickard Depo. 37-38, 42); *see also* Swickard Depo. at 39 (indicating no knowledge of whether the Plaintiff requested the computer training).) Given that a histology technician has limited interaction on computers, and that the Plaintiff failed to identify any evidence demonstrating that the training on the computer system in question would have prepared the Plaintiff for a particular position the Plaintiff sought, the Court concludes that the Plaintiff has failed to demonstrate that the Plaintiff suffered an adverse employment action. The Plaintiff has made no claim that the lack of computer training resulted in a change of pay, prevented her advancement, or reduced her job responsibilities in any way. Indeed, the fact that the Hospital transferred her from her histology technician position to a data entry position in Client Services (a position that required more interaction with computers) as an accommodation for her condition demonstrates that this lack of training did not hinder her employment opportunities or the Hospital's accommodation of her condition. Second, the Plaintiff has also failed to demonstrate the fourth prong of her prima facie case. The fact that the Hospital sent one person in her thirties and one in her fifties undermines the notion that the Hospital made a decision not to send the Plaintiff because of her age. Although both the Plaintiff and the younger employee were histology technicians, the Plaintiff has failed to demonstrate that they were similarly situated, i.e., in the same department, with the same job duties etc. Indeed the evidence suggests that the younger employee worked in the clinical laboratory where she would have constant interaction with the computer system while the Plaintiff worked in the histology department where her interaction with the computers was limited. (Swickard Depo. at 42). For these reasons, the Court agrees with the Hospital that this event does not demonstrate age discrimination.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1681125 (S.D.Ohio))

**\*18** Similarly, the Plaintiff failed to demonstrate the third and fourth prong of her prima facie case of age discrimination with respect to the national seminar. The record reflects that a younger employee attended the convention as an officer of the National Histology Association. The Hospital approved his absence but did not pay for his attendance. (Swickard Depo. at 40- 41). The Plaintiff cannot show an adverse employment action because the Plaintiff failed to identify any evidence in the record that she ever requested to attend the seminar or requested time off to attend the seminar. ( *See* Doc. # 23 at 97). In addition, because the Hospital did not pay for the younger employee to attend, the failure of the Hospital to send the Plaintiff was not an adverse employment action. The Plaintiff also fails the fourth prong because there is no evidence to support the claim that the Hospital selected attendees based on their age. Rather, the Hospital merely approved a leave of absence for an employee attending the seminar in an independent capacity. Thus, the Plaintiff failed to present any evidence that the Hospital treated this younger employee differently. Consequently, the Court agrees with the Hospital that this event also does not establish that the Hospital discriminated against the Plaintiff on account of her age.

Last, the Hospital argues that the alleged comments about her retirement fail to create a genuine issue of material fact on summary judgment because they are stray remarks, by nondecisionmakers, unrelated to the decision making process, and not close in time to the alleged adverse action. The Court agrees that the comments are insufficient to show age based animus directly or to satisfy the fourth prong of the Plaintiff's prima facie case. "Age -related comments, including suggestions of retirement, made by a person with supervisory or decision-making power may be used to prove discriminatory intent." *Wilson v. Reliance Trading Corp. of Am.*, No. 99-1181, 2000 U.S.App. Lexis 3644 at \*3 (March 6, 2000, 6th Cir.). However, not all age related comments relating to retirement provide evidence of discrimination. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir.1997) (references to retirement without reference to age or other more egregious circumstances do not amount evidence of age discrimination). In this case, the alleged statements by Ms. Swickard and Ms. Mayzum occurred sometime before October of 1996 and in the context of discussing the impact of her dermatitis on her ability to perform her job

functions. It is undisputed that her supervisors did not pressure her to retire. (Vinson Depo. at 292, 304-09). After these statements were allegedly made, as discussed in detail above, the Hospital provided the Plaintiff with numerous accommodations including leaves of absence, temporary positions, a permanent position in the Cardiology Department, and assistance in identifying other positions which the Plaintiff might perform. The crux of the Plaintiff's claim lays with the Hospital's unwillingness to reassign her after she left the cardiology department. By that time, the persons who allegedly made the age based remarks were no longer supervising the Plaintiff and the Plaintiff presents no evidence to demonstrate how they may have influenced the alleged decision not to reassign her. In any case, because the Court has concluded that the Hospital acted reasonably in its attempts to reassign the Plaintiff, there simply is no basis on which to conclude that these statements indicate that the Hospital discriminated against her on account of her age by refusing to reassign her. Therefore, the Court concludes that these statements do not create a genuine issue of material fact with respect to her age discrimination claim.

**\*19** Consequently, the Court agrees with the Hospital and GRANTS its motion for summary judgment on the Plaintiff's age discrimination claim.

C. CONTRACT CLAIM.

In response to the Hospital's Motion for Summary Judgment on her contract claim, the Plaintiff consents to an entry of dismissal of that claim. (Doc. # 23 at 27). According, the Hospital's Motion is GRANTED and the Plaintiff's contract claim is hereby DISMISSED.

D. PUBLIC POLICY CLAIM.

The Plaintiff concedes that her public policy claims rise or fall with her statutory discrimination claims. (Doc. # 23 at 27). Consequently, given the Court rulings above the Court GRANTS the Hospital's Motion with respect to the Plaintiff's public policy claims.

IV. CONCLUSION.

The Hospital's Motion is GRANTED and this case is hereby DISMISSED in its entirety with prejudice.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                     Page 16
**(Cite as: 2001 WL 1681125 (S.D.Ohio))**

IT IS SO ORDERED.

2001 WL 1681125 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works