NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

**FILED**

**INFORMATION COPY**
**MANDATE NOT YET ISSUED**
**DIS. CT. # 01-00707**

No. 04-3584

JUL 0 6 2005

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| GERRY E. BINGAMAN and ANNIE BRANTLEY, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| THE PROCTER & GAMBLE COMPANY, | ) ) ) | OPINION  **FILED** |
| Defendant-Appellee. | ) ) ) | JUL - 6 2005  JAMES BONINI, Clerk  CINCINNATI, OHIO |

Before: KENNEDY and MOORE, Circuit Judges, and RESTANI,[*] Judge.

**KAREN NELSON MOORE, Circuit Judge.** In the underlying action, Plaintiffs-Appellants Gerry E. Bingaman and Annie Brantley (collectively, the "Plaintiffs") allege, *inter alia*, that Defendant-Appellee The Procter & Gamble Company ("P&G") wrongfully terminated their employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; Ohio Revised Code § 4112.02; and § 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140. P&G moved for summary judgment, and the magistrate judge below issued a Report and Recommendation ("R&R") concluding that the motion should be granted. Over the Plaintiffs' objections, the district court adopted the magistrate judge's R&R, and judgment was entered in favor of P&G. The Plaintiffs now appeal. We **AFFIRM**.

---

[*]The Honorable Jane A. Restani, Chief Judge of the U.S. Court of International Trade, sitting by designation.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Factual Background

#### 1. P&G's Ivorydale Facility

At the time of the events underlying this case, P&G operated a manufacturing and warehousing facility in St. Bernard, Ohio known as Ivorydale. The Ivorydale facility initially included three manufacturing plants (Olean, Soap & Beauty Care, and Foods), as well as a warehousing operation that was comprised of warehouse storage units and two scale houses (the Murray Road Scale House and the Spring Grove Scale House) where trucks entering and leaving Ivorydale would be weighed. In 1999, however, P&G began executing a plan referred to as the "3S Project." As part of the 3S Project, P&G ceased its warehousing operations (including management of the scale houses) at Ivorydale and entered into a contract with another company to provide these services. As a result, approximately fifty to one hundred P&G employees working in the Ivorydale warehousing department had their jobs eliminated. The vast majority of these employees, however, were reassigned to the Ivorydale facility's manufacturing plants, which at that time were still operated by P&G.[1]

In 2000, P&G employed approximately 720 non-exempt employees at the Ivorydale facility: 706 Manufacturing Technicians, four Administrative Technicians,[2] and ten Administrative &

---

[1] In 2003, Trillium Health Care Products, Inc. purchased the Ivorydale manufacturing facility from Defendant-Appellee The Procter & Gamble Company ("P&G"). The facility now operates under the name "St. Bernard Soap Company" and is under contract to provide manufacturing services to P&G.

[2] Under the 1999-2002 collective bargaining agreement, the Administrative Technician classification was eliminated, and persons holding existing Administrative Technician positions were given the option of remaining in the union as an Administrative Technician or being reclassified as a non-union Administrative & Technical employee.

2

Technical ("A&T") employees. Manufacturing Technicians provided production-related support (performing such tasks as operating and repairing manufacturing equipment), Administrative Technicians provided secretarial support for each of the manufacturing plants, and A&T employees served in departments such as Human Resources and Accounting. Manufacturing Technicians and the Administrative Technicians at the Ivorydale facility were represented by the Employees' Representation Association. The A&T employees, on the other hand, did not belong to the union.

### 2. The Plaintiffs

The Plaintiffs, Gerry Bingaman ("Bingaman") and Annie Brantley ("Brantley"), are two former P&G Manufacturing Technicians who worked in the Ivorydale scale houses and whose positions were eliminated under the 3S Project. Bingaman was hired by P&G in 1977, and during his tenure as a P&G employee Bingaman worked in several parts of the Ivorydale facility, including, *inter alia*, the Crest toothpaste packaging department and the Ivory soap plant utilities department. In 1990, while working in soap utilities, Bingaman slipped on a stairwell, crushing the bones in his heel. After recovering from his injury, Bingaman was able to return to his soap-utilities position. In March 1991, Bingaman was reassigned to another position which Bingaman believed he could not perform fully as a result of the injury to his heel, prompting him to file a claim of handicap discrimination with the Ohio Civil Rights Commission; the record before us, however, does not appear to indicate how Bingaman's complaint was ultimately resolved.

In 1993, Bingaman began working in the Murray Road Scale House as a Scale House Technician, a largely sedentary position designated for persons P&G had classified as "Partially Disabled Employees" or "PDEs." Bingaman continued to serve as a Scale House Technician until February 2000, when he took a leave of absence in anticipation of surgery on his injured heel.

Bingaman then chose not to have the surgery and was cleared by his doctors to return to work in July 2000. However, the contracting out of the scale house operations had been completed by that time, and Bingaman was placed on an unpaid leave of absence. Efforts to place Bingaman in another Ivorydale position proved unsuccessful, and Bingaman's employment with P&G was terminated on November 6, 2000.

Brantley was also a career P&G employee, having worked for the company as an Ivorydale Manufacturing Technician from 1976 until her termination in 2000. In 1985, while working in one of the Ivorydale warehouses, Brantley suffered an injury to her shoulder that led to the imposition of a temporary lifting restriction. In 1986, Brantley won the bid for a position in the Murray Road Scale House, and she then began serving as a Scale House Technician. Brantley's shoulder problems persisted, and Brantley reinjured her shoulder in 1998. As a result of her worsening shoulder problems, Brantley's doctors imposed a permanent lifting restriction. Over time, Brantley developed arthritis in her knees, broke her ankle in a non-work-related incident, and had surgery on her feet to remove bone spurs.

Brantley continued to work in the Ivorydale scale houses until March 2000 when P&G ceased its scale-house operations. Brantley was then placed on a leave of absence. In July 2000, Brantley returned to work at the Ivorydale facility, this time as a quality inspector in the Olay facial wipes department. During Brantley's second week in this department, however, the production line suffered a series of equipment failures, requiring Brantley to remove containers from the production line and place them in tall stacks. Because of the strain this work placed on her shoulder, Brantley ceased working and returned to leave status. On April 21, 2001, Brantley's employment with P&G

was terminated because P&G claimed it could not find a position for her at the Ivorydale facility that complied with her physical restrictions.

## B. Procedural History

In October 2001, the Plaintiffs filed suit against P&G in the U.S. District Court for the Southern District of Ohio. Both Bingaman and Brantley brought claims for intentional infliction of emotional distress and violations of the ADA, Ohio Revised Code § 4112.02, and § 510 of ERISA. The complaint also included a claim by Brantley alleging that P&G had discriminated against her on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. P&G moved for summary judgment, and the district court referred the matter to a magistrate judge. The magistrate judge concluded that summary judgment should be entered in favor of P&G and issued an R&R to that effect. The Plaintiffs then filed objections to the magistrate judge's R&R, urging the district court not to adopt the magistrate judge's R&R with respect to their ADA, § 4112.02, and § 510 claims.[3] After reviewing de novo the record and the Plaintiffs' objections to the R&R, the district court in March 2004 issued an order adopting the R&R and directing that judgment be entered for P&G. The Plaintiffs now appeal to this court.

---

[3] The Plaintiffs did not object to the magistrate judge's Report and Recommendation ("R&R") with respect to Brantley's age discrimination claim and the Plaintiffs' claims for intentional infliction of emotional distress, and the Plaintiffs have informed this court that they are not appealing the entry of judgment in favor of P&G on these claims. Pl.-Appellants' Br. at 4 n.1 ("Bingaman and Brantley did not object to the R&R with respect to the dismissal of their emotional distress claims and Brantley's age discrimination claim. Therefore, Bingaman and Brantley are not appealing the District Court's ruling with respect to those claims.").

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 933 (6th Cir. 2000). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Although "[w]e must accept the non-moving party's evidence, and draw all justifiable inferences in his favor," *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), *cert. denied*, 125 S. Ct. 1300 (2005), we also must bear in mind that "[t]here is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Plant*, 212 F.3d at 934 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### B. Disability Discrimination Claims

#### 1. ADA Claims

The Plaintiffs first argue that the district court erred in granting P&G's motion for summary judgment with respect to their ADA claims. We conclude, however, that the Plaintiffs have failed to present sufficient evidence that would allow a reasonable to jury to find a violation of the ADA, and thus the district court properly entered summary judgment in favor of P&G.

Enacted in 1990, the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A covered employer violates the ADA if it fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). Such "'reasonable accommodation[s]' may include," *inter alia*, "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position . . . ." 42 U.S.C. § 12111(9). When an employee asserts a claim of disability discrimination based on the employer's failure to reasonably accommodate the employee's disability, the employee "'must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation. If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship.'" *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 728 (6th Cir. 2000) (internal quotation marks and citations omitted).

On appeal, Plaintiffs contend that P&G violated the ADA by failing to reasonably accommodate Plaintiffs' disabilities following the elimination of their Scale House Technician positions. Specifically, Plaintiffs assert that P&G should have considered transferring the Plaintiffs to other P&G facilities besides Ivorydale and that P&G should have explored whether positions at

the Ivorydale facility could be modified to accommodate the Plaintiffs' restrictions. We conclude that the district court did not err in granting summary judgment to P&G with respect to these claims.

### a. Failure to Accommodate Via Transfer or Reassignment

Entry of summary judgment with respect to the Plaintiffs' failure-to-transfer claim is proper because the Plaintiffs failed to carry their burden of demonstrating that positions were available at other P&G facilities for which the Plaintiffs were qualified and which would have accommodated the Plaintiffs' restrictions. To establish a *prima facie* case of disability discrimination based on the denial of an opportunity to transfer following elimination of the plaintiff's position, the plaintiff must show that: (1) the plaintiff is disabled within the meaning of the ADA; (2) at the time the plaintiff was terminated, the plaintiff was qualified for other available positions within the corporation; (3) the employer did not offer such positions to the plaintiff; and (4) a similarly-situated employee who is not disabled was offered the opportunity to transfer to an available position, or there is other direct, indirect, or circumstantial evidence supporting an inference of disability discrimination. *Cf. Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 253, 256-58 (6th Cir. 2000) (establishing that "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified"); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998) (explaining that "[a]lthough an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, the employer violates the ADEA [Age Discrimination in Employment Act] when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination" and setting forth elements of *prima facie* case for such claims).

In their appeal, Plaintiffs assert that P&G's transfer policy did not forbid their transfer to other P&G facilities outside Ivorydale. The Plaintiffs further argue that, even if P&G's transfer policy were interpreted as generally barring transfers outside Ivorydale, enforcing such a policy with respect to the Plaintiffs would be unreasonable because it would not serve the policy's purpose of retaining skilled workers at the Ivorydale facility. We conclude, however, that even assuming the Plaintiffs are correct in these assertions, the district court's entry of summary judgment in favor of P&G was not in error because the Plaintiffs have simply failed to produce any evidence that there were any available positions within P&G that would have accommodated Plaintiffs' restrictions and for which the Plaintiffs would have been qualified.

Although the Plaintiffs included in their summary judgment briefing general descriptions of various sedentary and light-work jobs available at P&G, these descriptions do not state whether any of these positions were vacant at the time the Plaintiffs were seeking to be transferred. While the record does include a list (possibly from September 2000) of positions that may have been available at P&G offices in the Cincinnati area, little is known regarding what qualifications employees in such positions must have. Indeed, Bingaman admitted during his deposition that he did not know whether or not he would be qualified for any of these positions. J.A. at 345-46 (Gerry Bingaman Dep. at 315-16) ("Q. Do you know whether or not they required any degrees? A. Some did. Q. And you didn't have those degrees to the extent they required it? A. That is correct. Q. So you would not qualify for those, correct? A. Accordingly [sic] to the guidelines if the degree was necessary, that is correct."); J.A. at 346 (Gerry Bingaman Dep. at 316) ("Q. Do you know whether or not as you sit here today whether you qualified for that job, based on the requirements? A. I would say that I did, but then as I say, unless I actually see the requirements for the job I couldn't confirm that as a fact.

9

Q. Would that be true for all of these jobs that are listed here? A. Yes, that is true."); J.A. at 382-85 (P&G Jobs by Location).

Similarly, Brantley suggested during her deposition that she could have worked in a mail room at Ivorydale or another P&G facility, but she also acknowledged that she did not know if any of these positions were vacant. J.A. at 439 (Annie Brantley Dep. at 209) ("Well, you know, P and G, they have — they always have jobs for people. You know, at the time I could have worked in the storeroom, I could have worked in the mail room, I could have went back to what I was doing. I mean, it's always a job somewhere at P and G. And it don't even have to be there. It could have been over in the ITC. They got a mail room over there."); J.A. at 440-41 (Annie Brantley Dep. at 210-11) ("Q. So my question is, are you aware of any actual job vacancy that existed within your limitations, that existed in— A. No, I'm not. Q. —April of 2001? A. I'm not aware."). The record does include a notice of a customer service position available in the Ivorydale central storeroom, apparently posted sometime before the end of April 2001. J.A. at 490-91 (Opportunity Transfer Notice). Although the position description does set forth in some detail what qualifications applicants for the position should have, the record is simply too scarce with respect to Brantley's skills and experience for us to conclude that there is a genuine issue as to whether Brantley would have qualified for the position or whether the position would have satisfied her physical restrictions. J.A. at 490 (Opportunity Transfer Notice) (noting that "[t]asks to be performed include all facets of the storeroom operation: counter work, shipping/receiving, inventory control, parts look up and research, origination and filing, inventory reduction. Need strong logical thinking and problem solving skills, strong computer skills, numerical skills, strong mechanical skills, strong communications and interpersonal skills, strong leadership skills, flexibility in taking on new and

different work and working effectively with minimal direction" and stating that position includes "a requirement to rotate back to the Core up to 20% of the time").

Finally, the record suggests that the Technical Centers jobs for which Plaintiffs claim they should have been considered markedly differed from the Scale House Technician positions the Plaintiffs had previously occupied: whereas the Ivorydale Scale House Technician positions had been classified as union-represented, Manufacturing Technician-level positions, the Technical Centers appear to have been staffed entirely by non-union, A&T workers. *See Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir.) ("[I]n order to satisfy its duty under the ADA, an employer is only required to transfer an employee to a position comparable to the employee's prior position. . . . The ADA does not require an employer to offer an employee a promotion as a reasonable accommodation. . . ."), *cert. denied*, 125 S. Ct. 68 (2004).

We acknowledge that the Plaintiffs have alleged that, while they were employed with P&G, the company failed to provide them assistance in locating positions outside Ivorydale for which they might have been qualified. This, however, does not relieve the Plaintiffs of their obligation during the discovery process to assemble an evidentiary record showing that positions meeting their restrictions were available and that the Plaintiffs were qualified for such positions. *See Peltier v. United States*, 388 F.3d 984, 989-90 (6th Cir. 2004) (affirming entry of summary judgment for United States on Rehabilitation Act claim, explaining that the plaintiff's "failure to demonstrate that she was qualified for any vacant positions in the [office to which she sought transfer] at time of her transfer defeats her disability discrimination claim"); *Burns*, 222 F.3d at 258 (affirming grant of summary judgment to employer in a failure-to-transfer suit because the employee "simply did not show that he was qualified to perform the positions that he now identifies in his brief as potential

11

accommodations"). Thus, we conclude that the district court did not err in granting summary judgment to P&G on the Plaintiffs' failure-to-transfer claims.

### b. Failure to Accommodate Through Job Modifications

The Plaintiffs also allege that P&G violated the ADA by failing to make reasonable modifications to existing positions that would have allowed the Plaintiffs to continue working at the Ivorydale facility following the closure of the scale houses. Specifically, Plaintiffs argue that P&G's team-based approach to staffing its manufacturing plants (referred to as the "High Performance Work System") would have allowed non-disabled team members to assist the Plaintiffs with those job tasks that the Plaintiffs could not perform because of their restrictions. Plaintiffs' argument on this score, however, is unavailing because the Plaintiffs have failed to articulate with any specificity what types of job tasks would be shifted to other manufacturing team members. Without knowing in more detail the particular job modifications Plaintiffs sought, no reasonable jury could determine whether such accommodations would be reasonable or whether they would result in the shifting of "essential" work tasks to other employees. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632-33 (6th Cir. 1999) (explaining that "the ADA requires 'job restructuring' as a reasonable accommodation' in appropriate circumstances. However, . . . 'job restructuring' within the meaning of the ADA only pertains to the restructuring of non-essential duties or marginal functions of a job" and concluding that "[c]ontinuing the practice of 'assisting' [the plaintiff] in tasks on an *ad hoc* basis may be sound labor relations policy for defendants, as we can imagine that such circumstances could promote employee loyalty and teamwork. However, employers are not required to do so under the ADA") (citations omitted); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998) (noting that the "Plaintiff had the duty to propose an objectively reasonable accommodation"). In sum, the Plaintiffs

have failed to establish that they were "otherwise qualified" for employment at Ivorydale and thus have failed to set forth a *prima facie* case of disability discrimination.

### 2. § 4112.02 Claims

Pursuant to Ohio Revised Code § 4112.02, an employee states a claim for handicap discrimination if the employee demonstrates that: (1) the employee is handicapped; (2) the employer took adverse action against the employee because of the employee's handicap; and (3) the employee is capable of performing the essential functions of the job in question. *Plant*, 212 F.3d at 938 (citing *Hazlett v. Martin Chevrolet, Inc.*, 496 N.E.2d 478, 480 (Ohio 1986)). Both this court and the courts of Ohio have relied on federal law interpreting the ADA in adjudicating § 4112.02 claims for handicap discrimination. *See id.* at 938-39. Moreover, the parties here have not separately addressed the Plaintiffs' ADA and Ohio state-law claims. Thus, we conclude that, for the same reasons we discussed with respect to the Plaintiffs' ADA claims, summary judgment in favor of P&G is also proper with respect to the Plaintiffs' § 4112.02 handicap discrimination claims.

### C. ERISA § 510 Claims

The Plaintiffs' final argument on appeal is that the district court erred in entering summary judgment in favor of P&G on their § 510 ERISA claims. Section 510 provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . . The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 1140. Thus, "ERISA § 510 offers protection against two types of conduct: adverse action taken because a participant availed himself of an ERISA right (an 'exercise' or 'retaliation'

violation), and interference with the attainment of a right under ERISA (an 'interference' violation)." *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 506 (6th Cir. 2004). Although the Plaintiffs labeled their § 510 claims as retaliation violations, we believe that the Plaintiffs' claims are more appropriately viewed as interference claims. The Plaintiffs do not allege that P&G terminated their employment based on the Plaintiffs' previous exercise of an ERISA right, but rather allege that P&G terminated their employment in order to avoid future obligations to pay ERISA benefits. J.A. at 21 (Am. Complaint at 7) (labeling Count V as one for "ERISA Retaliation" but alleging that "Defendant intentionally, willfully, and wantonly discriminated against Plaintiffs Bingaman and Brantley by terminating their employment to prevent them from exercising their rights and increasing their benefits under Defendant's employee benefit plans").

In the absence of direct evidence that an employer terminated the plaintiff's employment in order to interfere with the employee's ability to obtain ERISA benefits, a plaintiff must establish a *prima facie* case of § 510 interference in order to avoid summary judgment. *See Coomer*, 370 F.3d at 506; *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). "[T]he plaintiff can state a prima facie case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Smith*, 129 F.3d at 865 (internal quotation marks and citations omitted); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 455 (6th Cir. 2003).

A plaintiff does not state a *prima facie* case of § 510 interference if the plaintiff demonstrates "only that he lost the opportunity to accrue new benefits." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001). Rather, a § 510 plaintiff must also establish that his employer "had the specific intent of avoiding ERISA liability when it discharged him. Otherwise,

every employee discharged by a company with an ERISA plan would have a claim under § 510." *Id.*; *see Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 452 (6th Cir. 1999) (affirming entry of summary judgment in favor of employer on § 510 claim, explaining that, "[g]iven that Plaintiff offered no proof that [his employer] encouraged him to resign or accepted his resignation in order to prevent him from making a claim for employee benefits, we hold that the district court properly determined that Plaintiff failed to present sufficient evidence to make a prima facie case under ERISA"); *Abbott v. Pipefitters Local Union No. 522 Hosp., Med., and Life Benefit Plan*, 94 F.3d 236, 242 (6th Cir. 1996) ("[A] plaintiff under § 1140 must demonstrate that the action at issue was taken with the specific intent to violate ERISA, i.e., that a motivating factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits."), *cert. denied*, 519 U.S. 1111 (1997). The Plaintiffs here have failed to produce any evidence from which a reasonable jury could infer that P&G terminated their employment in order to avoid having to provide the Plaintiffs with ERISA benefits. J.A. at 338-39 (Gerry Bingaman Dep. at 286-87) ("Q. Do you have any specific facts that you can testify to now to support the allegation that the company's specific intent in terminating you was to prevent you from exercising your rights and increasing your benefits under the employee benefit plans? A. Yes. Q. And what are those facts? A. The fact that I was not accommodated. Q. Anything else? A. No, sir."); J.A. at 445-46 (Annie Brantley Dep. at 243-44) ("Q. My question is, do you have any factual information that the reason the company decided to terminate you, in whole or in part, was to prevent you from exercising your rights and increasing your benefits under the company's employee benefit plans? A. I don't know. Q. You don't have any facts? A. No."). Thus, we conclude that the district court did not err in ordering summary judgment in favor of P&G on Plaintiffs' § 510 ERISA claims. *See Majewski*, 274 F.3d at 1114.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's order granting summary judgment to P&G on all counts.